(No. 66545.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDREW JOHNSON, Appellant.

*Opinion filed April 16, 1992.—Modified on denial of rehearing June 25, 1992.*

BILANDIC and FREEMAN, JJ., took no part.

Randolph N. Stone and Rita A. Fry, Public Defenders, of Chicago (Jeffrey M. Howard, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Sally L. Dilgart and Catherine A. Bernard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

The defendant, Andrew Johnson, and his codefendant, Terry Sanders, were indicted by a Cook County grand jury for the murder of William Feuling with three counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1) through (a)(3)), armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)), one count of attempted murder of Brian Walkowiak, and one count of attempted murder of Art Kozak (Ill. Rev. Stat. 1983, ch. 38, par. 8—4). The State nol-prossed the remaining counts charging armed violence, residential burglary, home invasion, unlawful restraint, and aggravated battery.

Prior to the trial, defendant and codefendant Sanders were granted a severance because Sanders' defense of compulsion was antagonistic to defendant's defense of misidentification and alibi. There was a simultaneous trial before separate juries. Following the jury trial,

defendant was found guilty of murder, attempted murder, and armed robbery. The defendant waived a jury for the sentencing hearing. On August 6, 1986, following a sentencing hearing held pursuant to section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) defendant was sentenced to death for the murder of Feuling. In addition, the court sentenced defendant to 30 years of imprisonment for the attempted murder of Walkowiak to be served consecutively to the death sentence, and 30 years for the attempted murder of Kozak, to be served consecutively to both sentences.

The defendant has appealed directly to this court pursuant to section 4(b) of article VI of the Illinois Constitution of 1970 and under Supreme Court Rule 603 (134 Ill. 2d R. 603). We affirm defendant's convictions.

On January 20, 1985, defendant accompanied two other individuals, Terry Sanders and Mike Hill, to the apartment of the victim, Feuling. This particular day was one of the coldest ever in Chicago, the temperature reaching 20 degrees below zero with a wind chill of over 70 degrees below zero. Terry Sanders, a codefendant with Johnson, was an employee at the convenience store which Feuling managed, and which was owned by Feuling's brother, Edward. When the three arrived at Feuling's apartment, they were invited in. Sanders introduced one of his friends as "Charlie" and the other as "Mike." In the apartment at the time were two of Feuling's friends, Art Kozak and Brian Walkowiak. Kozak and Walkowiak later would identify the defendant as the man introduced as "Charlie." Defendant was wearing a black, waist-length leather jacket. Sanders was wearing a long tan coat, and Hill wore a red ski parka and cap. All three visitors kept their coats on.

Once they were inside the apartment, Feuling offered everyone a beer. Defendant accepted and Feuling went to the kitchen and returned with a can of Miller beer for

defendant. "Mike" then left the room to use the bathroom. When he returned, both he and defendant drew their guns. The defendant then shouted that it was a robbery and directed that each victim be tied up and gagged. Sanders used electrical cord and speaker wire to bind the victims. Defendant then went into the kitchen, returning with a butcher knife, a hammer and an egg.

Once Feuling, Kozak, and Walkowiak were bound and gagged, defendant began striking Feuling in the face with the barrel of the gun, asking "Where's the guns, where's the money." Defendant next demanded money from Kozak, who told him there was no more. Defendant then said, "Well then, you have to die." Defendant saw Kozak's gold watch, took it, and said, "Well, this will let you go for a while." After moving back from Kozak, defendant smashed the egg in Kozak's face and began laughing. Defendant then dragged Feuling through the apartment, looking for guns and money. Defendant and Feuling ended up in the dining room, where defendant demanded that Feuling hand over the receipts from the store. Feuling refused, saying that he did not have them, whereupon defendant began stabbing Feuling with the butcher knife. Defendant held up Feuling by the arm, laughing while he continued stabbing and slashing Feuling repeatedly about the neck and torso. Feuling eventually died as a result of these wounds.

When he finished with Feuling, defendant handed the knife to Sanders and said, "Now you each have to kill one." Sanders tried to kill Kozak by jabbing the knife into his stomach and then trying to cut his throat. Sanders then took the hammer and smashed Kozak on the head, breaking the handle off of the hammer. Defendant took Hill's gun and pointed it at Walkowiak. Walkowiak then charged for the door leading outside, and Sanders hit him with a fireplace iron. As Walkowiak ran out the door, Kozak saw defendant shoot him in the

shoulder. Defendant, Sanders and Hill followed Walkowiak out the door, and Kozak closed the door behind them. Walkowiak flagged down a passing motorist, told the driver there had been a robbery and a shooting, and had the motorist take him to a hospital.

Shortly thereafter, several blocks from Feuling's apartment, defendant and Hill approached another individual, Oscar Smith, and tried to take Smith's car at gunpoint. At one point during this exchange, Smith and defendant were face to face as defendant tried to get Smith to get in the car with the defendant. Smith refused and a struggle ensued in which the gun was knocked from defendant's hand. Defendant fled, leaving behind the gun he had used at Feuling's apartment. Smith flagged down a police car. Smith and the police officer looked for the two men, and Smith gave the gun to the police officer.

After closing the door, Kozak, with his hands still tied behind his back, knocked the phone to the floor and hit the "0" button. Mumbling through his gag, he told the police what had happened, and the 911 dispatcher told him the police were on the way. The police arrived several minutes later. Feuling was beyond help by the time they arrived. The police found Kozak with his hands tied and a scarf around his face. He had a bump on his head, a cut on his throat and a slash on his stomach. Although he was hysterical at the time, Kozak could describe two of the men who had been there. He told the police that both were black males, about 20 to 23 years of age and 5 feet 10 inches or 5 feet 11 inches tall. One of the men was wearing a black jacket, blue pants and black shoes. The other man was wearing a long, tan coat.

In the meantime, Sanders had split off from the defendant and Hill. He had approached two uniformed police officers who were on a lunch break at a pizzeria, located about six to seven blocks from Feuling's apart-

ment. Sanders told the officers that "two guys" from the Cabrini housing project had committed a terrible crime, that there had been a shooting and stabbing at a nearby apartment. Two other officers were called in to accompany Sanders back to the apartment. When they arrived at the apartment, Kozak saw' Sanders standing in the hallway with the two officers and screamed, "That's one of them." Sanders replied, "I thought you were dead." Sanders was then placed under arrest.

A short time later, police officers from the crime lab arrived. They photographed the crime scene, dusted for prints, and collected certain items of evidence, including a wooden hammer handle, a scarf, video cartridge boxes, a knife from behind the living room sofa, several electrical cords and speaker wire, and a fireplace poker. A Miller beer can located on the living room coffee table was dusted for prints. Eight ridge impressions were found, which were later compared and matched to those of defendant by the latent print unit of the Chicago crime lab.

Robert Feuling, the victim's brother, testified that the day after the occurrence he returned to the crime scene around 2 p.m. He noticed a blue nylon parka, with orange lining, in the stairwell which led to the basement of the apartment house. He notified the police. Evidence technicians photographed and searched the jacket, and found a Chicago Transit Authority bus transfer dated January 20, a Joliet Correctional Center card bearing the institution number 44051 with the name A. Johnson on it, and a prescription label. The police called the Joliet Correctional Center and obtained a photograph of defendant. This photograph was used in the photographic array shown to the witnesses.

The day after the occurrence, the photographic array, consisting of six black and white photographs, was shown to Art Kozak and Brian Walkowiak. Walkowiak

was still in the hospital at the time. Both men independently identified defendant. Within the next few days, a lineup was conducted in which five individuals were shown, at separate times, to Kozak, Walkowiak, and Oscar Smith. All three independently identified defendant at these lineups. All three also independently identified defendant at trial.

Defendant testified he was never present at the scene of the crime. He stated that he had been at his girlfriend's apartment until late in the afternoon of the day of the occurrence, at which time he went out to get a bottle of schnapps. He stated he was wearing the only coat he owned, a navy-blue knee-length trench coat given to him when he left the penitentiary in December 1984. He testified after he bought the schnapps, a "couple of guys" approached him and demanded that he give them money, and that when he told them he did not have any, they threw him up against a wall and pulled off his coat, which contained his parole officer's card, a prescription for medication, and his birth certificate. He stated that he then returned to his girlfriend's apartment for the remainder of the evening and ended up spending the night there. He further testified that he did not own a black leather coat between December 24, 1984, and January 23, 1985, the date of his arrest. His girlfriend corroborated this alibi, stating that defendant had gone to the liquor store at approximately 5 p.m. that day and returned about 40 minutes later. She testified that she noticed when he returned that he was not wearing the navy-blue wool-like coat which he had on when he left the apartment. When she asked him where his coat was, he responded that he was robbed at the store.

Defendant was arrested January 23, 1985, and questioned by Assistant State's Attorney George Ellison that evening. Ellison testified that he prepared a statement

from the defendant which the defendant refused to sign. Ellison stated that during the conversation in which the statement was taken, the defendant stated that he did not tell his girlfriend that he had been robbed. This was confirmed by Detective Ronald Branum of the Chicago police department, who was present during Ellison's conversation with the defendant.

In all, defendant raises 23 issues for review. Four concern alleged errors made during trial, 10 concern those made during sentencing, one asserts ineffective assistance of counsel, and the remaining eight challenge the constitutionality of the Illinois death penalty statute.

## A. Alleged Errors at Trial

### 1. Separate Juries

Defendant moved to sever his trial from the codefendant, Sanders, on the basis of antagonistic defenses. The court granted defendant's motion, finding that defendant's alibi defense and the codefendant's compulsion defense were antagonistic. A multiple jury procedure was used. Under this procedure, defendant and the codefendant were tried simultaneously by separate juries. The record in this case shows that the trial court adequately prepared the jurors for this procedure. Each jury was repeatedly admonished that its sole concern was the particular individual whose guilt or innocence it would eventually determine. This court allowed the use of the multiple-jury procedure in *People v. Ruiz* (1982), 94 Ill. 2d 245, 259.

Defendant stated he was not present during the commission of the crimes for which he was convicted. Codefendant Sanders, however, defended himself by asserting he was forced to take part in the crimes by defendant.

Although defendants in the same cause are generally tried together, a defendant may request a severance, for

example, if he believes his defense is antagonistic with that of his codefendant to the point where he could not receive a fair trial. (*People v. Bean* (1985), 109 Ill. 2d 80, 93.) It is within the discretion of the trial court whether severance will be granted, a decision which will not be reversed absent a showing of an abuse of discretion. (*People v. Dougherty* (1984), 102 Ill. 2d 533, 541.) In the case at bar, the trial court allowed separate juries based upon the antagonistic defenses of the two defendants.

Here, the State offered testimony against both defendants in the presence of both juries. However, cross-examination of the State's witnesses by either defendant was done only within the presence of that defendant's jury. Additionally, during each individual defendant's case only that defendant's jury was present in the courtroom. Each defendant was afforded the opportunity to develop his theory of defense through cross-examination of the State's witnesses before his own jury.

Defendant does not generally challenge the dual-jury procedure. Defendant argues that although his motion for severance was granted, it was effectively negated by the use of a simultaneous jury trial because his jury heard evidence, during the direct examination of the State's witnesses, from which defendant's jury could infer the codefendant's compulsion defense.

Defendant contends that this procedure deprived him of a fair trial. Defendant asserts that the testimony of Art Kozak and Brian Walkowiak, which was admissible only against his codefendant, was heard by his jury during the State's presentation of its case. The State asked Kozak and Walkowiak, during their direct testimony with both juries present in the courtroom, whether either one saw defendant threaten the codefendant or point his gun at the codefendant during the armed robbery, murder or attempted murder. The evidence established that the codefendant was an active and willing participant in the of-

fenses. Defendant made no objection to the trial court's decision to conduct simultaneous jury trials. Further, defendant failed to object to any of the testimony which he now labels prejudicial. The record reveals that there were no objections at the trial or in the post-trial motion on this subject, and that they would normally be waived. (*People v. Enoch* (1988), 122 Ill. 2d 176.) We find it important to address this situation due to the nature of the trial format.

Defendant argues that the direct testimony of Kozak and Walkowiak heard by both juries, and in particular by defendant's jury, is analogous to what the jury heard in *Bruton v. United States* (1963), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1622. Defendant admits that there was no extrajudicial statement by the codefendant implicating defendant introduced. Defendant contends that the State's witnesses, Kozak and Walkowiak, revealed to defendant's jury that the codefendant was compelled or threatened into committing these crimes. Defendant contends that his jury could infer from the codefendant's defense the inculpation of defendant while exculpating the codefendant.

Defendant contends that the direct inculpation of one defendant by another in a multiple jury trial is forbidden under *Bruton*. In *Bruton*, the Supreme Court reversed the armed robbery conviction of a defendant who had been implicated through the introduction, during a joint trial, of the codefendant's extrajudicial confession. The Court found the evidence and the confession of a nontestifying codefendant detailing the defendant's participation in the crime to be "devastating to the defendant." (*Bruton*, 391 U.S. at 136, 20 L. Ed. 2d at 485, 88 S. Ct. at 1628.) The confession of Bruton's codefendant, although admissible against the codefendant as the maker, was inadmissible hearsay as to Bruton. The jury in *Bruton* heard evidence which the State would have

otherwise been able to present only because of the joinder of the defendants for trial. The Supreme Court held that when the codefendant was not called to testify, the admission of such an incriminatory statement deprived the defendant of his constitutional right of confrontation.

We conclude *Bruton* does not apply to the case at bar. *Bruton* involved direct antagonism between two defendants before a single jury. The present case does not involve an inculpatory statement made by a codefendant who was unavailable for cross-examination. Here, defendant on appeal is challenging evidence given by the State's witnesses, occurrence witnesses at that. These witnesses, Kozak and Walkowiak, were subject to cross-examination before defendant's and the codefendant's juries. Kozak and Walkowiak testified as to what they heard and observed. The State was not doing indirectly that which it could not do directly. None of the evidence which defendant now complains of was inadmissible. Defendant had the right to confront and cross-examine the occurrence witnesses. Hence, there was no violation of the sixth amendment of the Federal Constitution.

The evidence of defendant's presence at the scene is overwhelming and obviates whatever, if any, inference defendant's jury could infer from the two occurrence witnesses: a beer can on the coffee table with the defendant's fingerprints on it; the coat found in the stairwell near the back door containing defendant's prescription for medication and his parole officer's card; the identification of defendant by photo, lineup, and in-court identification by the victims that survived; defendant's attempt to steal a car, during which he lost the gun used to shoot Walkowiak; and the detailed description and subsequent identification by Smith, the owner of the car.

Considering this evidence, the jury could simply have chosen not to believe defendant's alibi. The evidence was so overwhelming that if there was any error, it was

harmless error beyond a reasonable doubt. *People v. Bryant* (1983), 94 Ill. 2d 514, 523.

In short, none of the problems present in *Bruton* were present here, and so we find no support for the defendant's position.

## 2. Jury Selection

The next issue for review is whether the trial court's denial of defense counsel's motion to excuse a venire member for cause, because of alleged equivocal responses regarding his ability to set aside his biases, prejudices, and opinions, was *per se* reversible error.

During *voir dire*, defendant objected to a number of potential jurors, and ultimately used all of his peremptory challenges. This prevented him from keeping a particular venire member, James Handschiegel, off the jury. The defendant maintains that venire member Handschiegel gave answers during *voir dire* which prejudiced him against defendant, and as such he should have been dismissed for cause. We find this argument to be without merit.

Defendant refers to the following answers, given by venire member Handschiegel, concerning his relationship to two brothers-in-law who were with the Chicago police department, as proving error:

"THE COURT: Would that bring you to this courtroom with any feeling that you should give greater or lesser weight to the testimony of some officers merely because you have two in-laws who are policemen?

Mr. Handschiegel: No, I don't think so.

THE COURT: Would that have any effect upon your ability to be fair and impartial, the fact that you have some relatives who are policemen?

Mr. Handschiegel: No. I know what they go through according to what they tell me, but I think that would be all right."

Later, concerning burglaries which had occurred at his mother's house, the following took place:

"THE COURT: Would [that] bring you into this Court with any preconceived notions or feeling of ill will either against Mr. Johnson or against the system or anything like that?

Mr. Handschiegel: I don't think so. I don't know.

THE COURT: As best you could, you would try to judge this case without regard to what happened in the past to you personally?

Mr. Handschiegel: I would try, um-huh."

At the end of the *voir dire* of Handschiegel, the following took place:

"THE COURT: Can you think of any reason why you couldn't be a fair and impartial juror?

Mr. Handschiegel: No."

The defendant asserts that the juror's answers were equivocal and insufficiently objective to qualify him for the jury. The only case cited by defendant in support of this view is *People v. Stone* (1978), 61 Ill. App. 3d 654. In *Stone*, the defendant challenged the trial court's refusal to dismiss a certain venire member for cause. The reason for the challenge was the venire member's answers to questions relating to whether he could be impartial or not. In response to those questions, the venire member stated he did not think he could be impartial, and he believed that anytime anybody is charged, he thought that constituted evidence of guilt. Since these answers revealed a clear lack of objectivity, the reviewing court reversed the conviction because of the prejudice to the defendant. Our review of the venire member's answers here reveal no such lack of objectivity. Rather, the statements concerning whether he could set aside his personal feelings are, in our view, simply the particular idioms by which many people speak. Nowhere in the venire member's answers was there any indication

that he would not view the defendant in an objective, fair and impartial manner. Absolute certainty is not required, nor will the mere suspicion of bias be sufficient to dismiss a venire member. (*People v. Cole* (1973), 54 Ill. 2d 401, 415.) Rather, the party challenging the venire member must show the actual existence of a disqualifying state of mind as will raise the presumption of partiality. (*Cole*, 54 Ill. 2d at 413.) Furthermore, it is up to the trial court to determine whether or not the prospective juror has such bias as will prevent him from rendering a decision based on fairness and impartiality (*Cole*, 54 Ill. 2d at 413), a decision which will not be set aside unless against the manifest weight of evidence. We conclude that the trial court did not err in refusing to dismiss venire member Handschiegel for cause.

### 3. Prosecutorial Misconduct

### (a) Introduction of Evidence During Trial

The next issue on appeal is whether the State improperly aroused the emotions of the jury and induced a sympathy verdict against defendant. Specifically, defendant asserts that testimony brought out during the trial by the prosecution improperly inflamed the passions of the jury by pointing out that William Feuling left behind a large family. Furthermore, during closing argument defendant charges the prosecution improperly referred to the Feuling family in order to further inflame the passions of the jury.

Defendant argues the State obtained a guilty verdict by repeatedly eliciting improper testimony from the victim's brothers, Robert and Edward.

Robert Feuling was the State's first witness. Robert testified that he was the brother of the victim. He further stated he was married and had three children.

Robert was asked if his parents were alive, and he responded, "yes." The next question by the State was:

"Q. Are they in the courtroom?
ROBERT: Yes, sir.
ROUSE: Objection, judge.
COURT: Sustained. It is immaterial."

The next question that followed:

"Q. How many brothers and sisters do you have?
ROBERT: Four brothers and two sisters.
Q. Can you give their names and state their ages?
ROUSE: Objection, judge.
COURT: Overruled."

These were the only two objections posed by the defendant during Robert's direct testimony.

Robert owned the apartment where the crime occurred and the victim lived. Robert described the layout of the apartment. On January 19, 1985, the last time he saw the victim, he overheard a conversation between the victim and the codefendant, Sanders. The conversation was that the codefendant would be fired if he did not come to work, just as his sister.

The day after the murder, January 21, 1985, Robert found a blue ski parka at the bottom of the basement stairwell. He called the police, who examined the jacket and found a parole officer's card with defendant's name on it and a prescription label.

Edward Feuling was the fourth witness to be called by the State. Edward testified that he was the owner of the White Hen Pantry and that his brother, the victim, was the manager of the pantry. Edward stated that the codefendant and his sister, Erma Sanders, worked at the pantry. Edward testified that about 8 p.m. on the night of the murder, the codefendant called him at the pantry and said his brother, William Feuling, had been shot.

The only other objection raised by the defendant concerns a family photograph taken on December 24, 1984,

to which an objection was sustained and the photograph was not shown to the jury. The record does not reflect an objection to the December 24, 1984, "family photo" when shown to Robert, who identified the victim in the family photograph. Robert described the photograph as "a picture of my family as we looked on the 24th of December of '84."

Defendant contends that the testimony of Robert and Edward Feuling was analogous to the type of statements condemned by this court which call attention to a crime victim's family. (*People v. Bernette* (1964), 30 Ill. 2d 359, 370-72.) In *Bernette,* the State, on direct examination, asked specific questions of the widow of the murder victim, without objections by the defense, which elicited answers that her present address was in Madison, Wisconsin, that she lived there with her four children and a baby-sitter, that her oldest child was six and the youngest seven months, and that the youngest was the only one of the children born of her marriage to the deceased. Where testimony in a murder case points out the fact the deceased has left a spouse and family and such testimony is not elicited incidentally but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudical and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. (*Bernette,* 30 Ill. 2d at 370-71.) Defendant argues that the State exploited every opportunity to divert the jury's attention from the disputed issues in the case and focus it instead on the Feuling family.

While it is true that information of a decedent's family is generally forbidden in a capital trial, the type of information elicited must be examined to determine whether it falls within that prohibition. Not all information pertaining to family is of the type which will provoke the passion and prejudice of the jury. Information

of family relationships in which a dependent situation is not present may not necessarily fall within the prohibition set forth in *Bernette*. This is consistent with the language of *Bernette*: "[W]here testimony in a murder case respecting the fact the deceased has left a *spouse and family* is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial ***." (Emphasis added.) (*Bernette*, 30 Ill. 2d at 371.) The family involved in *Bernette* consisted of the spouse and a young child of the decedent. The State there attempted to improperly influence the jury by dwelling on this relationship.

Robert Feuling testified about the brothers and sisters, as well as the parents, of the decedent. Edward Feuling testified about his own family. Although technically these relationships fall within the definition of family, they are not the types of relationships which will provoke the passion and prejudice of the jury. The victim was an adult, living on his own, with no dependent relationship with any other member of his family.

However, family relationships, such as with children or a spouse, generally are properly limited because there exists a dependent relationship between the decedent and the family. The mention of them focuses the jury's attention on the loss to the survivors rather than on the guilt of the defendant and provides the jury with an excuse to punish the defendant which is immaterial to the task at hand. The jury may realistically believe the defendant has deprived the family of a breadwinner, or the spouse of a companion.

Such is generally not the situation with siblings and their families, or with parents, when the victim is an adult. Rarely is such a dependent situation present with these individuals. Under these circumstances, we do not believe the loss is of the type which would inflame a jury to cast aside reason in lieu of passion. There is a differ-

ence between the testimony of a father who has lost his 8-year-old son and a father who has lost a 25-year-old son. When the child becomes an adult, he has become independent, and while society may still acknowledge the grief, it is simply not to the same extent as when the man was a child.

Still, situations may arise where such a dependent situation may occur with these individuals, and where family members may feel the loss with a heavier burden. For example, *People v. Holman* (1984), 103 Ill. 2d 133, cited by defendant, involved testimony about a victim's mother and adult brother. However, these relationships took place within a single household, where a dependent relationship still existed. That situation is not present in this case; thus, *Holman* is distinguishable.

The elicitation of family information such as was used in *Bernette* and *Holman* is subject to the plain error rule, and its erroneous admission may be cause for reversal even without objection. Family information which does not exist within a dependent relationship does not fall within the confines of the plain error rule. However, where such information is erroneously admitted over objection, and is of such significance that it leads the jury to believe it is material, it may be cause for reversal. (*Bernette*, 30 Ill. 2d at 371.) Defendant here had only one objection overruled, which allowed the jury to hear the names and ages of the victim's siblings. We find that such limited information was insufficient to lead the jury to believe it was material, and so defendant's argument must fail.

Unlike defendant, we cannot find that the lack of objections to questions requires reversal as plain error. (*People v. Salazar* (1988), 126 Ill. 2d 424.) Unlike the cases in some decisions of this court where comments regarding the victim's family required reversal of the conviction, in this instance the State did not dwell on the

actual or supposed reaction of the victim's family. (*Bernette*, 30 Ill. 2d at 372.) The record demonstrates that this information was preliminary to relevant testimony of the victim's brother which was properly presented at trial. The evidence was not unduly emphasized or elicited in great detail.

These references to the surviving members of the victim's family were incidental, and when considered in context and in relation to the entire record, were not presented in such a manner as to cause the jury to believe them material as to the defendant's guilt. *People v. Free* (1983), 94 Ill. 2d 378, 415.

It is well settled that not every mention of a deceased's family will *per se* entitle the defendant to a new trial. (*People v. Del Vecchio* (1989), 129 Ill. 2d 265, 288.) "Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." (*Free*, 94 Ill. 2d at 415.) Hence, where such evidence is otherwise relevant, it is admissible, although it may have a tendency to prejudice the accused. *People v. Hairston* (1970), 46 Ill. 2d 348.

The references in the case at bar were of minor significance in light of the entire record. The evidence was not presented in such a manner as to cause the jury to believe it was material to the determination of guilt or innocence. *People v. Bartall* (1983), 98 Ill. 2d 294, 323; *Free*, 94 Ill. 2d 413-15; *People v. Jordan* (1967), 38 Ill. 2d 83, 92.

We conclude, beyond a reasonable doubt, that the testimony of Robert and Edward Feuling did not deprive the defendant of the constitutional right to a fair trial. The record in this matter is overwhelming as to defendant's presence and participation in the crimes such that it negated his defense of misidentification and his alibi. We find that the testimony of the victim's brothers concerning the family relevant and properly presented at

trial. No error occurred regarding the admission of the testimony which referred to the victim's family. This evidence was incidental to other relevant testimony of the victim's brothers, Robert and Edward Feuling, and it was not presented in such a manner as to cause the jury to believe it was material, considering all the evidence presented at the trial.

## (b) Closing Argument

The defendant also accuses the State of theatrics during closing argument which served to evoke the passions of the jury. The closing argument of the State included statements to the effect that the victim was speaking to the members of his family and his friends, summarizing the evidence given at trial. The defendant argues that the State obtained the guilty verdict by the remarks in closing rebuttal:

"Billy is talking to everyone in this courtroom. He is saying to his brother, Bob, Bob it was—it was him. It was him that I let into the apartment that night. I didn't think anything would happen. He was with Terry and I let him in because it was him.

He is talking to his parents, mom and dad, it was him I gave the beer to. I was trying to be fair, nice to people, even strangers because everybody deserves a break.

It's Billy talking to his brother, Eddie. Ed, it was him who tried to get the money from your store even though we didn't have any money. He talks to his partners, Art and Brian and says, you guys are right. It was him. You were right when you identified him. You were right. He was the one that tied us up. And, ladies and gentlemen, he talks to you and he says he was the one who killed me. Billy is back in this courtroom, scrawny, little skinny Billy, one hundred thirty-nine pounds, pointing his finger from the grave at this defendant and he is saying he's the one. He's the one."

In closing argument:

"You know, every day practically everybody in your community, you hear about crime, you think about crime, you see it on TV, you read about it. It's defeating, it's frustrating. You tell yourself that nothing can be done about it. It's getting out of hand and certainly, as an individual, can't do a thing about it."

Defense counsel's objection to this statement was overruled.

At the trial, defendant failed to object to most of the arguments which defendant now labels improper. The State is allowed a great amount of latitude in making closing argument and, absent a clear abuse of discretion, the determination of the trial court as to the propriety of the closing argument should be followed. *People v. Brisbon* (1989), 129 Ill. 2d 200, 223.

The prosecutor has the right to comment on the evidence, draw all legitimate inferences deducible from the evidence even if they are unfavorable to defendant, and comment on the credibility of the witnesses. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322 (and cases cited therein).) Although the State's comments may exceed the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark resulted in substantial prejudice to the defendant. *People v. Baptist* (1979), 76 Ill. 2d 19.

The defendant was not prejudiced by any of the remarks in question, and he has failed to show that any of these remarks were material to his conviction. Additionally, defendant has not challenged the sufficiency of evidence in this appeal. The evidence in this case is overwhelming: the positive identification, both in photographs and lineup, and the physical lineup by two occurrence witnesses. The third witness, Smith, also identified defendant in the physical lineup. There was also physical evidence presented at trial: fingerprints lifted from a beer can in the living room, and the docu-

ment found in the jacket. The defendant in the case at bar was proven guilty beyond a reasonable doubt. While we do not approve of the use of remarks such as those used by the State in its closing rebuttal, any error in closing argument, or rebuttal closing argument, was harmless error in light of all evidence beyond a reasonable doubt.

### 4. Identification

Defendant also argues that the identification of him by three separate witnesses should not have been admitted because the identification methods were unnecessarily suggestive and, hence, unduly prejudicial.

The facts show that the defendant was first identified by Walkowiak and Kozak in photographic arrays consisting of six photographs. The defendant contends the photographs were suggestive in that he was the only individual shown who precisely matched the descriptions given by Walkowiak and Kozak. Walkowiak's description was of a 22-year-old black male, with a small mustache, a combed-back short afro, pimples, pock marks, and wearing a waist-length black leather coat. Kozak's description was similar, but added to the description was a dark shirt and dark pants. Defendant was wearing the black coat in the photograph. Defendant contends his photograph was the only one of the five shown which matched these descriptions.

Oscar Smith described defendant as five feet eight inches, with a medium build, dark, and wearing a black coat. He viewed the defendant in a photograph of the lineup. Defendant complains that, among the five individuals included in the lineup, he was the shortest, and again was the only individual who matched the descriptions given by the witnesses. Additionally, he was the only individual in the lineup who possessed a medium build and, with the exception of Sanders, wore a black

coat. For these reasons, defendant suggests the lineup identifications were improperly suggestive. We disagree.

The law does not require that lineups and photographic arrays shown to witnesses include near identical or look alikes of the witnesses' descriptions. The court must look to the totality of the circumstances surrounding the identification to determine whether due process is violated. (*Stovall v. Denno* (1967), 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972.) The photographs shown to the witnesses all show African-American men of the same approximate age. That some may be dressed differently, or fail to have one or more of the characteristics described by the witnesses, is relevant only within the context of the totality of the circumstances.

The United States Supreme Court addressed the issue of unnecessarily suggestive lineup procedures in *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926. Situations in which an accused is prejudiced by the lineup procedures may include:

> "[T]hat all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect." (*Wade*, 388 U.S. at 233, 18 L. Ed. 2d at 1160-61, 87 S. Ct. at 1935-36.)

The theme running through all these examples is the strength of suggestion made to the witness. Through some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities. Although, as defendant points

out, it is true there was only one other individual wearing a leather coat, there is no indication this was by design. We might suspect suggestive activity had the perpetrator been ordered to wear an orange coat when all the others in the lineup were made to wear brown coats, or some other such activity which might single him out. But that did not happen. We see no error, here, where the defendant simply wore his own clothing. The defendant must show some evidence of improper influence. We can find none.

Furthermore, whereas defendant makes it a point to stress the significance of his clothing in the identifying procedures, in that he and he alone matched the descriptions in that fashion, the witnesses specifically identified him by his face at trial.

Defendant also argues that the lineup procedures were improper because he was the only individual in the lineup who was also seen by the witnesses in the photographic array. Lineups are not rendered inadequate, however, merely because the defendant is the only individual in the lineup who was also in the photographs. (*People v. Thompson* (1981), 93 Ill. App. 3d 995.) Some element of suggestiveness, pursuant to the requirements of *Wade*, must still be shown.

We conclude that the totality of the circumstances here warrants no reversal on the basis of improper identification of the defendant. The burden of proving a denial of due process through the identification procedures is on the defendant. (*People v. Richardson* (1988), 123 Ill. 2d 322, 348.) That burden was not met here.

## B. Alleged Errors During Sentencing

### 1. Mitigating Evidence

Defendant's next issue for review is whether the trial judge properly considered mitigating evidence prior to

the imposition of the death sentence. Defendant asserts he is entitled to a new sentencing hearing because the trial judge failed to take into account any mitigating factors when he imposed sentence. Section 9—1 of the Criminal Code states: "The court shall consider *** any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).) Thus, failure to do so results in a violation of the statute, in which case a new sentencing hearing would be mandated.

Defendant argues that the trial judge found "no mitigating factors whatsoever." We disagree. There are statutory mitigating factors as well as other mitigating factors not specifically detailed in the statute. Statutory mitigating factors may include but need not be limited to the following:

"1. the defendant has no significant history of prior criminal activity;

2. the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;

3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;

5. the defendant was not personally present during commission of the act or acts causing death." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).

Defendant's argument, in essence, is that the trial judge failed to take into account the mitigating factors in determining sentence. We find this is an incorrect conclusion from the facts. The trial judge detailed his consideration of the mitigating factors during the sentencing hearing. With respect to the caring attitude the

defendant supposedly possessed toward his family, the trial judge noted that, while the defendant's family may suffer somewhat from his death, it was not a sufficient mitigating factor in light of the absolute lawlessness of the defendant in the past. With respect to defendant's disadvantaged background, the trial judge noted that attributing murderous behavior to a low standard of living was an insult to the thousands of people who live in such conditions throughout the country and nevertheless live within the guidelines of the law.

Additionally, defendant's attempt to compare the instant case with that of *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, is misplaced. In *Eddings*, the defendant's disadvantaged background included a violent home life of excessive physical punishment by the defendant's father. The case at bar is clearly of a different nature, for there was no evidence of such violence within the home of defendant. Finally, with respect to the defendant's age, it is clear from the record the defendant was well acquainted with lawlessness, and in fact previous crimes simply led to even greater criminal behavior. Based upon all of these factors, we do not believe the sentencer failed to take note of the mitigating factors. Rather, the trial judge took them into account and in the end found them insufficient to preclude the sentence of death.

Although the defendant presented several witnesses in mitigation, none of them gave testimony which would bring the defendant within the mitigating factors section of the statute. It is within the context of the statutory language in which the trial judge's statement above should be read. Clearly, the defendant's interpretation of the trial judge's statement is based upon the testimony of his witnesses. As to that testimony, however, the trial judge stated: "I do not believe any of the other material that has been brought to my attention on behalf of Mr.

Johnson is a mitigating factor sufficient to preclude the imposition of the death sentence ***."

Whereas it is incumbent upon the sentencer to consider mitigating factors, the existence of one or more such factors does not mandate a sentence other than death. (*People v. Phillips* (1989), 127 Ill. 2d 499, 535.) The sentencing procedure in a capital case depends upon the balance between aggravating and mitigating factors. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 452.) Here, the aggravating factors outweighed the mitigating factors.

During the sentencing hearing, the defendant brought forward witnesses to cast him in the light of a caring son and brother. His age, disadvantaged background and remorse were detailed as further reasons for not imposing the death sentence. Such was the nature of his mitigation.

The aggravating factors, however, were numerous. The evidence at trial showed the defendant to have been not only without hesitation in the murder which occurred, but also to have reacted with laughter and enjoyment during the death of the victim. The testimony of the witnesses detailed the attitude of the defendant as a man with no appreciation for human life. Instead, the defendant was clearly shown to be an individual who stabbed and slashed another for the sheer enjoyment of seeing another human being in agony.

Another aggravating factor was the defendant's clear lack of remorse for the murder which he committed. As the trial judge observed, not once during the trial did he see the defendant with anything other than a smirk or a smile on his face. It was only when the defendant was confronted with the death penalty at his sentencing hearing that a look of remorse appeared. Clearly, the sentencing judge weighed the credibility of the defendant's look of remorse and found it wanting.

Defendant's reliance upon various cases concerning this issue is misplaced. He cites *Penry .v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934, *Hitchcock v. Dugger* (1987), 481 U.S. 393, 95 L. Ed. 2d 347, 107 S. Ct. 1821, *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669, and *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, to support his contention that the trial judge erroneously failed to consider the mitigating factors which might preclude the death sentence for the defendant. These cases are, however, inapposite. They dealt with sentencers who failed to allow mitigating factors into evidence, or refused to consider them as a matter of law. That did not occur here, and there was no error on this issue.

### 2. Victim Impact Statement

Defendant contends that he was deprived of a fair sentencing because the trial court, over the objection of defense counsel, allowed Vern Feuling, the victim's father, to testify to the victim impact statement that he helped to prepare. Vern Feuling's testimony explained the effect of the victim's death upon him and other family members. The defendant's objection relies on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, which held that it was unconstitutional to introduce victim impact testimony in a capital sentencing hearing.

In *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597, the United States Supreme Court reconsidered its holdings in *Booth* and *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207, that the eighth amendment bars the admission of victim impact evidence during the penalty phase of a capital trial. The Court determined that there is no reason why a capital sentencer should not

take into account the effect of a defendant's action. It noted that the seriousness of an offense has traditionally been a determining factor in passing sentence. The Court reasoned that how a crime affected others was simply an additional factor in concluding how serious the offense actually was. *Payne*, 501 U.S. at 824-25, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.

While we acknowledge the shift brought about by *Payne*, it is not necessary for us to address every situation in which victim impact evidence might occur. Our rulings up to this point are sufficient to convince us of the victim impact statement's admissibility in this case. Of primary significance is that the statement was given before the trial judge as sentencer, who is presumed to factor in only relevant evidence in determining the appropriate sentence. (*Phillips*, 127 Ill. 2d at 537.) Also, the trial judge here made extensive findings in preparation for his ruling, with no apparent reliance upon the victim impact evidence. This is not a case such as *People v. Terrell* (1989), 132 Ill. 2d 178, cited by defendant, wherein the trial court mentioned the victim impact evidence during sentencing only to repudiate its import at a later time. Here, the trial court made no mention of the victim impact statement at all and, in fact, explicitly stated that the statement played no role in the sentencing decision. Also, the prosecutor did not dwell upon the victim impact testimony in arguing to the court that the death penalty should be imposed. Under the circumstances presented here, where the trial court sentences without reference to the statement, we find no error. This court has previously adopted *Payne* in the case of *People v. Howard* (1991), 147 Ill. 2d 103. To the extent *Payne* and *Howard* permit the introduction of victim impact evidence, we concur.

### 3. Imposition of Sentence

Defendant's next three issues for review concern the trial judge's basis for imposing sentence. Defendant contends the trial judge improperly considered several factors in passing sentence. He contends the trial judge improperly imposed the death sentence based upon (1) the trial judge's belief that the defendant would harm or kill an inmate or prison guard, (2) the trial judge's belief the defendant would escape from prison and harm or kill again, and (3) emotion. Had the trial judge imposed sentence based upon any of the above beliefs, a new sentencing hearing would be required. *People v. Holman* (1984), 103 Ill. 2d 133, 163-64.

When a trial judge is the sentencer, there are several presumptions which the law makes. One of them is that the trial judge bases his decision upon competent and reliable evidence. Another is that the trial judge is presumed to ignore irrelevant, inflammatory or emotional factors in determining the sentence. For us to find otherwise requires the challenger to the decision of the trial court to bring forth evidence which shows the trial judge to have made a decision on a basis other than that presumed. *Phillips*, 127 Ill. 2d at 537; *People v. Terrell* (1989), 132 Ill. 2d 178, 218.

The defendant argues the trial judge sentenced him to death based upon the belief the defendant would harm or kill a fellow inmate or prison guard if not put to death. Although the defendant cites numerous alleged improprieties on the part of the State during argument, he sets forth no evidence which would tend to establish the trial judge's reliance upon these improper statements, with one exception. The defendant relies upon a statement made by the trial judge during sentencing. Specifically, the defendant notes the trial judge made the statement, "[W]here are we safe from Andrew Johnson,

I believe that the evidence overwhelmingly says, no-where." Inasmuch as the defendant attempted to escape while awaiting sentence and was missing for nearly a full day, such a statement is simply a reflection of the facts before the court.

Defendant also bases his assertion that the trial judge considered improper factors on statements made by the State during closing arguments. The prosecution de-clared, "This citizenry has the right to be protected from people like him who will commit—who commit these crimes on the street, and citizenry includes people in the penitentiary, who may run into him on a bad day for him." Defendant fails to include in his brief, however, the fact that he objected to this comment, as well as the trial judge's reply that he would not consider the State's comment.

The defendant points to other arguments which he declares improperly influenced the trial judge's decision. For example, the State declared during closing argu-ments, "Andrew Johnson is a time bomb with a chip on his shoulder against society." The State also asserted that defendant should be put to death to protect the citi-zenry. Other comments followed a similar vein. Consider-ing the violent nature of the murder for which defendant was convicted, we believe these comments to be reason-able inferences from the evidence and thus not improper. (*People v. Albanese* (1984), 104 Ill. 2d 504, 520.) Further-more, defendant has failed to convince us of any link be-tween the alleged improper statements and the trial judge's decision. Without any evidence of a cause and ef-fect relationship, the trial judge is presumed to rely upon only competent and reliable evidence. (*People v. Phillips* (1989), 127 Ill. 2d 499.) The defendant has failed to over-come this presumption.

It is for a similar reason that defendant's arguments with respect to the remaining contentions on this issue

must fail. Although the defendant points out numerous supposed improprieties on the part of the State, he fails to establish any link with the trial judge's determination of sentence. This failure, as we have said, provides us with no basis upon which to alter the sentence.

Defendant also objects to the State's reference to the defendant with the terms "animal," "evil," and "creature." Our opinions have frowned upon such terminology in the past because it serves no useful role in the trial of an individual. However, absent some indication that such remarks have resulted in substantial prejudice to the defendant, we have generally declined to reverse on this basis. (*People v. Spreitzer* (1988), 123 Ill. 2d 1.) Defendant has failed to show substantial prejudice here, and so we decline to reverse.

### 4. Intent

Defendant's next issue for review is whether the trial court failed to find the defendant intended the death of Feuling. For the purposes of imposing the death sentence, it is incumbent upon the sentencer to determine whether an aggravating factor exists. Section 9—1(b)(6) sets forth the statutory aggravating factors for felony murder. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) It makes the felony murder factor applicable either where the defendant kills intentionally or with knowledge that his actions create a strong probability of death or great bodily harm. Defendant argues that the trial court failed to make any finding that defendant, in performing the acts which caused William Feuling's death, acted with this intent.

Defendant's argument is similar to that used in *People v. Thompkins* (1988), 121 Ill. 2d 401. In *Thompkins*, the defendant argued that the imposition of the death penalty was improper where the jury, although instructed as to all three forms of murder—intentional,

knowing, and felony murder—received and returned only a general verdict of guilty. The defendant contended that the court's finding of eligibility for the death penalty was erroneous because there was no basis for the conclusion that the defendant intended the death of the victim. The court determined:

"It is the general rule in Illinois that:

'[W]here an indictment contains several counts arising out of a single transaction, and a general verdict is returned the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained.' [Citations.]

Applying the above rule, we conclude that the jury's return of general verdicts raises a presumption that it found defendant guilty of [intentional murder]." *Thompkins*, 121 Ill. 2d at 455-56.

The situation in the case at bar is analogous. The jury was charged with instructions which included intentional murder, and a general verdict was returned. That raised the presumption that the jury found the defendant guilty of intentional murder. During the sentencing hearing, the trial judge took judicial notice of the jury's verdict. Since the verdict encompassed the necessary finding of intent, there was no omission on the part of the trial judge, and defendant's argument must fail.

### 4a. Additional Alleged Error of the Verdict Form

The defendant, in a supplemental brief, raises an issue not previously raised either at trial or in a post-trial motion. Defendant contends that the doctrine of collateral estoppel precludes the imposition of the death penalty where the jury was instructed on the three forms of murder and returned a general verdict form. The verdict form tendered at the trial was not objected to. Defend-

ant has waived any allegation of error by failing to object to the verdict form when tendered, or to submit an alternate verdict form for consideration. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 441.) Defendant also failed to raise this issue in his post-trial motion; thus, the issue is waived. *People v. Enoch* (1988), 122 Ill. 2d 176.

### 5. Excessive Sentencing

Defendant argues this court should vacate his death sentence because it exceeds that given to another defendant in a case similar to his. Although this court does compare sentences imposed on different defendants when they arise out of the same incident, it has not been our practice to review and compare sentences when they arise from different operative facts. (*People v. Perez* (1985), 108 Ill. 2d 70, 92.) Defendant's argument is essentially a request for a proportionality review. Although some states presently have proportionality review (see Ga. Code Ann. §17—10—35(c)(3) (1982)), Illinois does not so mandate. The issue of whether proportionality review is required under the Federal Constitution was addressed by the United States Supreme Court in *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871. There it was determined that the eighth amendment to the Federal Constitution does not require such review. Other safeguards imposed upon death penalty statutes, such as those which limit the sentencer's discretion, are sufficient to prevent the arbitrariness which proportionality review seeks to eliminate. With this in mind, we see no reason to reverse our past course on this issue.

### 6. Consecutive vs. Concurrent Sentencing

Defendant's next issue for review is whether the consecutive sentences for attempted murder should be made concurrent. He argues that by virtue of having

the sentence of death imposed upon him, he is not subject to consecutive terms of imprisonment for the remaining sentences, relying upon *People v. Terrell* (1989), 132 Ill. 2d 178. Although the State would concede the point, we find it proper to disagree.

The decision in *Terrell* is distinguishable. The *Terrell* court found the imposition of consecutive sentences untenable because the first of two sentences by which the consecutive nature would be determined was a death sentence. However, the *Terrell* court had previously found that the death sentence was not a sentence which would subject the defendant to compliance under the consecutive sentencing statute. (*Terrell*, 132 Ill. 2d at 229.) Thus, the defendant there could not be subjected to consecutive sentences.

According to the statute, "[t]he court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).) Both attempted murders are subject to Class X sentences, and the record reveals severe bodily injury in the gunshot wound to Brian Walkowiak. These requirements having been met, the trial judge was not precluded from imposing consecutive 30-year sentences for the two attempted murder convictions. Defendant is correct only insofar as the 30-year sentences cannot run consecutive to the death sentence.

### 7. Order of Argument at Sentencing Hearing

Defendant's final alleged error at sentencing is whether the trial judge erred by allowing the State to

argue first and last at the sentencing hearing, a right which the defendant claims as his own. He claims this right by virtue of having the burden of coming forward with evidence of mitigating factors sufficient to preclude the imposition of the death penalty after the State established the existence of a statutory aggravating factor.

This court has consistently rejected defendant's argument. (*People v. Caballero* (1984), 102 Ill. 2d 23, 47-48; *People v. Williams* (1983), 97 Ill. 2d 252, 302-03; *People v. Ramirez* (1983), 98 Ill. 2d 439, 469.) Mitigating factors sufficient to preclude imposition of the death penalty can be addressed at trial, even if no further evidence at all is introduced at the sentencing hearing. (*People v. Gacy* (1984), 103 Ill. 2d 1, 100; *People v. Johnson* (1986), 114 Ill. 2d 170, 207.) The very nature of sentencing in Illinois is one of balancing. (*People v. Brownell* (1980), 79 Ill. 2d 508.) Yet the factors required to be balanced have different procedural characteristics which provide the State with the right to argue first and last.

The State is required to establish sufficient aggravating factors to meet the standards set out for the death penalty. (*Ramirez*, 98 Ill. 2d at 469.) Since the burden of coming forward with this determinative evidence is on the State, the State is allowed to argue first and last at the sentencing hearing. The State argues first in order to establish the existence of these aggravating factors. Should this burden not be met, then no mitigating factors need be presented. Thus, the true burden sits with the State.

Although it is the defendant's responsibility to bring forth whatever mitigating factors may exist, it is not a duty, for there is no requirement that mitigating factors be before the sentencer. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c).) Thus, defendant's reliance on *People*

*v. Olinger* (1986), 112 Ill. 2d 324, 351, is misplaced. That case merely set out the fact that it is up to the defendant to set out his mitigation, rather than the State, for which it would be illogical to establish mitigation when alternatively trying to establish sufficient aggravation to support the death penalty. There was, no shift in the burdens, but rather simply the establishment of where the respective responsibilities fell.

Defendant, however, cites *Liptak v. Security Benefit Association* (1932), 350 Ill. 614, in support of his contention that he was entitled to open and close at the sentencing hearing. *Liptak* is easily distinguishable from the case at bar. In *Liptak,* this court held that a defendant asserting an affirmative special plea and admitting the establishment of plaintiff's case is entitled to open and close in presenting evidence and argument since the defendant had the burden of proof. The burden here was on the State, and not defendant, thus the State properly argued first and last.

## C. Effective Assistance of Counsel

Defendant maintains that should this court fail to overturn his conviction for any other reason, then it must do so on the basis of ineffective assistance of counsel. This assertion is based on the fact that several of the errors of which he now complains were not properly preserved for review during trial or in his post-trial motions. The defendant asserts that if we deem these issues waived because they were not properly preserved for review, then he has been denied effective assistance of counsel, and should receive a new trial.

The standard for reversal on an issue such as this is that the defendant must establish that his counsel's performance was unreasonably deficient, and that but for the alleged errors, the outcome of the trial would

have been different. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525; see also *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) It is a two-part test, and the failure of the defendant to prove either part renders his argument ineffective. Here, we determine that the alleged errors of which the defendant complains would have had no effect on the outcome of the trial. The evidence against him was overwhelming, and we believe the outcome of the trial would have been no different without the alleged errors. Thus, we find no merit in this argument.

### D. Alleged Errors Regarding Constitutionality of Death Penalty Statute

Defendant's final eight issues for review concern the constitutionality of the Illinois death penalty statute. We have previously addressed the issues raised by the defendant and find here that the defendant has provided no compelling reason for altering our view on the statute's viability.

Defendant first asserts that the Illinois death penalty is unconstitutional on the grounds that it does not require pretrial notice of intent to seek the death penalty. This court discussed that issue in *People v. King* (1986), 109 Ill. 2d 514, and we see no reason to depart from the decision there.

Defendant next asserts error in that the statute allows post-conviction prosecutorial discretion to seek the death penalty. This argument is based on a violation of the eighth amendment to the United States Constitution. This court's decision in *People v. Kubat* (1983), 94 Ill. 2d 437, renders that argument ineffective.

Next, defendant challenges the statute on the basis it places the risk of nonpersuasion on the defendant at sentencing. This court rejected that argument in *Peo-*

*ple v. Bean* (1990), 137 Ill. 2d 65, 138-39, and we see no reason to reverse that position here.

Defendant also contends the statute violates his constitutional rights because it fails to require the prosecution to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the death penalty. This issue was resolved in *People v. Crews* (1988), 122 Ill. 2d 266, and *People v. Mahaffey* (1989), 128 Ill. 2d 388, and we find the defendant's reasons to reconsider these holdings to be unpersuasive.

Defendant challenges the information-gathering procedures of the statute and asserts they are ineffective to the point of constitutional violations. We decline, however, to reverse the position stated in *People v. Stewart* (1984), 105 Ill. 2d 22. Defendant also challenges the statute due to its failure to provide for proportionality review. This court dealt with that issue in *People v. Ashford* (1988), 121 Ill. 2d 55, and again we decline to reverse this court's position on that issue.

Defendant's next constitutional challenge asserts that his death sentence should be overturned because the statute does not require or permit the sentencer to determine that death is the appropriate, ultimate penalty when there is no mitigation or when the mitigation does not outweigh the aggravation. This contention was rejected in *People v. Johnson* (1987), 119 Ill. 2d 119, and we decline to reverse that prior determination.

Defendant's assertion that the statute is unconstitutional because it does not provide a means to ensure that all aggravating factors relied upon by the sentencer are relevant or constitutionally permissible is unpersuasive. He makes no argument and gives no authority for his assertion, and, as this court noted in *People v. Perez* (1985), 108 Ill. 2d 70, we will not re-

view such an argument when it is raised in such an improper fashion.

The defendant would have us believe that a recent United States Supreme Court decision alters the constitutionality of one of the statutory mitigating factors—no significant history of prior criminal activity—as being overly broad and vague. His argument is based upon *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853. However, *Maynard* is inapposite, since it examined the effect of a statutory aggravating factor, rather than a statutory mitigating factor. Furthermore, this issue was not properly preserved for review, and so we deem any argument made by the defendant waived.

For the reasons set forth above, we affirm the defendant's convictions and sentence of death. The clerk of this court is directed to enter an order setting Tuesday, September 29, 1992, as the date on which the sentence of death entered by the circuit court is to be executed. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be delivered by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Affirmed.*

JUSTICES BILANDIC and FREEMAN took no part in the consideration or decision of this case.