NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official

copy of the following opinion will be published by the Supreme

Court's Reporter of Decisions in the Official Reports advance

sheets following final action by the Court.

                                    

                  Docket No. 76406--Agenda 1--May 1996.

       THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DARRIN

W.

                           SHATNER, Appellant.

                    Opinion filed September 19, 1996.

     JUSTICE HEIPLE delivered the opinion of the court:

     Following a trial in the circuit court of Cook County, a

jury

found the defendant, Darrin Shatner, guilty of first degree

murder,

armed robbery, and arson. The defendant waived the jury for his

sentencing hearing. The trial court found defendant eligible for

the death penalty based on the aggravating factor that he killed

the victim in the course of another felony. 720 ILCS 5/9--1(b)(6)

(West 1994). Finding that there were no mitigating factors

sufficient to preclude the imposition of the death penalty, the

court sentenced defendant to death. The defendant's sentence has

been stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this

court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603.

     On appeal to this court, defendant argues that: (1) his

counsel was ineffective for failing to present a sufficient

defense

to the charge of felony murder; (2) his counsel was ineffective

for

failing to challenge his eligibility for the death penalty during

the eligibility phase of the sentencing hearing; (3) the trial

court erroneously limited the cross-examination of a State

witness;

(4) his waiver of a sentencing jury was not knowing and

intelligent; (5) he was denied a fair sentencing hearing by the

introduction of gang affiliation evidence; (6) he was denied a

fair

sentencing hearing by the introduction of religious practices

evidence; (7) his counsel was ineffective for failing to object

to

the State's introduction of evidence concerning defendant's gang

affiliation and religious practices; (8) the trial court erred by

considering his history of drug abuse solely in aggravation; (9)

the sentence of death is excessive and inappropriate given the

circumstances of the case; and (10) the Illinois death penalty

statute is unconstitutional. For the following reasons, we affirm

defendant's convictions and sentence.

                                BACKGROUND

     Evidence at trial revealed the following. In the afternoon

of

September 1, 1986, defendant went to the home of a neighborhood

drug dealer, Joaquin, to purchase some cocaine. When he arrived,

he

met the victim, Daniel Schneider, and the victim's friend and

former coworker, Jean Rogoz. The victim invited everyone to his

condominium to eat and to watch a movie. Defendant and Rogoz

accepted his invitation.

     The three arrived at the victim's residence. As the victim

began to prepare chicken for dinner, defendant and Rogoz left to

purchase some beer at a liquor store. Rogoz testified that on the

way back to the victim's condominium, defendant asked her whether

the victim had any valuables or money. After returning to the

victim's residence, Rogoz overheard the defendant question the

victim about whether he had anything they could sell in order to

purchase some cocaine. The victim responded that he did not want

to

sell any of his belongings.

     Rogoz further testified that, after she had taken some

chicken

and a glass of milk from the kitchen and sat down in the living

room, she heard the victim cry out, "Jeannie, help me." Upon

turning around she saw that the defendant had grabbed the victim

from behind and was holding a six-inch pocket knife to his

throat.

Defendant began dragging the victim down the hallway towards the

bedroom and ordered Rogoz into the bedroom. In the bedroom,

defendant began to punch the victim with his fists until the

victim

was dazed. Defendant then left the room. According to Rogoz,

defendant returned with a wooden lamp, a phone cord, and some

cloth. Defendant bound the victim's legs with the cord and his

hands with the cloth. After next striking the victim in the head

with the wooden lamp, defendant began searching through the

victim's dresser drawers. When the victim sat up in bed and

looked

at Rogoz, defendant struck him again with the lamp until he fell

off the bed.

     Rogoz stated that defendant next cut up the mattress and

threw

the stuffing around the room. The defendant then lit the bed and

stuffing on fire. He grabbed Rogoz and told her that she was

going

with him. Before they left the apartment, defendant took the

victim's VCR.

     Thereafter, the defendant and Rogoz returned to Joaquin's by

bus. Rogoz claimed that she told Joaquin what had happened, but

he

told her that there was nothing he could do. Defendant and

Joaquin

exchanged the VCR for cocaine. After using the cocaine, defendant

and Rogoz took another bus ride to the apartment of a friend of

the

defendant, where they stayed the night.

     The following day, defendant noticed a story in the

newspaper

regarding the victim's death. Rogoz testified that she asked him

why he burned the victim, and the defendant replied, "To free his

spirit." Defendant told Rogoz that he needed money to get away

and

Rogoz suggested that they set up a time to meet her brother, from

whom she could get some money.

     At approximately 7 p.m., Rogoz and the defendant met her

brother in a parking lot. Rogoz testified that she was able to

get

away from the defendant at that time and that her brother took

her

to a friend's house where she called the police. Although she

could

not reach a detective that evening, she went to the police the

next

day.

     Detective Ernest Halvorsen, with the Chicago police

department, testified that he was assigned to investigate the

murder of Daniel Schneider. After questioning Rogoz and the

defendant's parents, Detective Halvorsen obtained a warrant for

the

defendant's arrest. However, he was unable to locate the

defendant.

Three years later, in December of 1989, the FBI contacted

Detective

Halvorsen and offered its assistance in the investigation.

Eventually, in October of 1990, the FBI located the defendant in

Portland, Oregon, where he was arrested.

     Special Agent James D. Russell, with the FBI, testified

about

the circumstances of the defendant's arrest. After he was placed

under arrest and transported to the Portland FBI office,

defendant

gave an oral statement to Russell. In this statement, he admitted

that he met Rogoz and the victim at Joaquin's apartment. However,

defendant claimed that it was Rogoz's idea to rob the victim and

that she repeatedly pressured him to commit the crime. Although

defendant initially resisted her entreaties, he accompanied Rogoz

to the victim's apartment and assisted her in carrying out the

robbery scheme because he was physically attracted to her.

Defendant admitted initiating the robbery by grabbing the victim

around the throat from behind in the kitchen and dragging him

towards the back bedroom. However, defendant stated that as he

was

dragging the victim towards the bedroom, Rogoz struck the victim

in

the head with a vase or jar and a lamp, despite defendant's

requests that she stop doing so. After defendant placed the

victim

on his bed, he checked his pulse to ascertain that the victim was

still alive. Defendant stated that he then took off his bloody

shirt and put on a shirt belonging to the victim. Defendant

claimed

that while he retrieved the VCR from the living room, Rogoz cut

up

the victim's bed and set it on fire. After they left the victim's

apartment, defendant and Rogoz returned to Joaquin's apartment.

They traded the VCR for cocaine.

     Based on the information defendant provided, Russell

prepared

a written statement, which he read aloud to the defendant.

Defendant made a few changes to the statement and signed it.

Shortly thereafter, defendant was extradited to Illinois.

     Defendant's trial commenced on May 13, 1993. In addition to

the testimony previously outlined, the State also presented the

testimony of Dr. Yuksel Konacki, who performed the autopsy on the

body of the victim. His examination revealed that the victim's

hyoid bone, the bone surrounding the larynx in the front of the

neck, was fractured. Based on his findings, Dr. Konacki opined

that

the primary cause of the victim's death was strangulation while

the

secondary cause was blunt trauma to the head.

     Benjamin Lieu, defendant's former cellmate at the Cook

County

jail, also testified. He stated that, while they were

incarcerated

together, defendant told him that women were unreliable and that

the woman who was with him when he committed a murder panicked

and

did not help him at all. Defendant also told Lieu that he hit the

murder victim with a lamp, and that he had to hit him many times

because he had a very strong spirit.

     Defendant testified on his own behalf at trial. His

testimony

was consistent with his statement to the FBI. He claimed that

Rogoz

instigated the events leading to the victim's death. Although

defendant conceded that he grabbed the victim from behind, he

claimed that it was Rogoz, not he, who struck the victim

repeatedly

and set him on fire. Defendant further stated that following the

events at the victim's apartment, Rogoz voluntarily accompanied

defendant to Joaquin's, where they ingested more cocaine.

Defendant

and Rogoz then spent the next few days together.

     Mike Marshall, a former employee of the defendant's father,

also testified for the defense. He claimed that he witnessed the

defendant and Rogoz engaging in sexual relations at his father's

office the day after the murder occurred, and that defendant did

not appear to be restraining Rogoz.

     Following deliberations, the jury returned a general verdict

of guilty to the charges of first degree murder, armed robbery,

and

arson. Since defendant had waived his right to be sentenced by

the

jury prior to trial, sentencing took place before the same judge

who presided over his trial.

     After the first stage of the sentencing hearing, the judge

found defendant eligible for the death penalty based on the

aggravating factor that he killed another during the course of a

felony. At the second stage of the sentencing hearing, the State

presented evidence of defendant's prior criminal history,

including

his arrests for theft, criminal damage to property, battery and

resisting arrest. The State also presented testimony indicating

that defendant practiced rituals in his jail cell in which he

would

chant and toss a feather about while naked and that he read books

about satanic worship. The evidence also revealed that defendant

fought in jail and that he was charged for possessing a shank in

his cell.

     In mitigation, defendant presented evidence indicating that

he

had felt unloved as a child, had begun using drugs when he was

13,

and that, prior to his arrest, had been employed as a carpenter

and

was in a long-term relationship with his current girlfriend, with

whom he had had a child. In allocution, defendant stated that he

knew he was part of the murder, but that he did not intend to

kill

the victim. Defendant also stated that he was not a devil

worshipper.

     Following the sentencing hearing, the trial court found no

mitigating factors sufficient to preclude the imposition of the

death penalty and sentenced defendant to death.

                                 ANALYSIS

                   I. Ineffective Assistance of Counsel

     Defendant first contends that he received ineffective

assistance of counsel at trial because his attorney failed to

provide him any meaningful defense at all. Defendant impugns,

among

other things, his counsel's closing argument, wherein he stated:

          "I submit to you that [defendant's] statement about

what

          happened is the correct version of what happened, and

          then if he's guilty of anything, he's guilty of

robbery.

          What a tragedy to find this man guilty of murder that

was

          committed by [Rogoz], and she walks out Scot-free."

As this language indicates, defense counsel suggested that if

defendant was guilty of anything, it was robbery, and not murder,

because defendant never killed the victim, nor had he intended to

do so. While acknowledging that this defense theory was

appropriate

to rebut the counts of intentional murder and knowing murder,

defendant argues that his counsel was ineffective because, by

conceding that defendant participated in a robbery during which

the

victim was killed, his counsel admitted felony murder.

     A defendant alleging a violation of this sixth amendment

right

to effective assistance of counsel must generally meet the two-

pronged test established by the United States Supreme Court in

Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S.

Ct. 2052 (1984), and recognized by this court in People v.

Albanese, 104 Ill. 2d 504 (1984). Under Strickland, the defendant

(1) must show that his counsel's performance fell below the

objective standard of reasonableness and (2) must demonstrate

that

there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have

been

different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104

S.

Ct. at 2068. A court need not determine whether counsel's

performance was deficient before examining the prejudice suffered

if it is easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice. Strickland, 466 U.S. at

697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; Albanese, 104 Ill.

2d

at 527.

     As an initial matter, defendant contends that because his

counsel wholly failed to subject the State's case to meaningful

adversarial testing, ineffective assistance of counsel can be

presumed without application of the Strickland test. See United

States v. Cronic, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039

(1984). In so arguing, defendant places principal reliance on

People v. Hattery, 109 Ill. 2d 449 (1985).

     The Hattery defense counsel, during opening argument,

proclaimed:

               "Ladies and gentlemen of the jury, he [defendant]

          did it. He did everything [the prosecution] just told

          you. ***

               We are not asking you to find [the defendant] not

          guilty. At the end of your deliberations, you will find

          him guilty of murder. We are asking you to consider the

          evidence that you hear today and in the next few days

to

          explain why he did the horrible thing that he did. Once

          you have found him guilty, we will proceed and you will

          find him eligible for the death penalty. The question,

          and the only question facing you, will be whether to

          impose the death penalty on Charles Hattery for trying

to

          save the life of his family. Thank you." Hattery, 109

          Ill. 2d at 458-59.

During the guilt-innocence phase of trial, defense counsel

advanced

no theory of defense, presented no evidence on defendant's

behalf,

and chose not to make a closing argument to the jury. This court,

finding that the defense counsel deprived Hattery of the right to

have the issue of his guilt or innocence presented to the jury as

an adversarial issue, concluded that defendant was denied the

effective assistance of counsel without applying the two-prong

Strickland test and ordered a new trial.

     Defendant's contention that the defense tactics employed by

his counsel are analogous to those employed by the defense

counsel

in Hattery cannot withstand even the most superficial scrutiny.

The record reveals that the instant defendant's counsel was his

advocate throughout the proceedings. He presented both opening

and

closing arguments; cross-examined virtually all of the State's

witnesses; presented several witnesses, including the defendant,

on

the defendant's behalf; objected often and strenuously to the

admission of adverse evidence; and moved for a mistrial on

several

occasions. It is untenable to suggest that the proceedings below

approached the adversarial breakdown of the Hattery proceedings,

where defense counsel acted not as a advocate for the accused but

as a proponent for the prosecution. Accordingly, we reject

defendant's invitation to discard the two-prong Strickland test

in

reviewing his ineffective assistance claim.

     We turn, then, to an examination of the first prong of the

Strickland test--whether defense counsel's performance fell below

an objective standard of reasonableness. Defendant, relying on

People v. Chandler, 129 Ill. 2d 233 (1989), argues that it did.

Chandler was charged with murder, residential burglary, and

arson.

After his arrest, he made a statement, introduced at trial, in

which he admitted to breaking into the victim's home, but stated

that it was his codefendant who had stabbed the victim.

Chandler's

trial counsel presented no witnesses on his behalf and Chandler

himself did not testify. During closing argument, defense counsel

conceded that Chandler had entered the victim's house, but argued

that he did not stab the victim.

     This court held that defense counsel's performance in

Chandler

amounted to ineffective assistance of counsel. The Chandler court

reasoned that, even if counsel had succeeded in persuading the

jury

that defendant did not kill the victim, the jury was still

instructed to find defendant guilty of murder under the law of

accountability for felony murder. Chandler, 129 Ill. 2d at

246-47.

Thus, the Chandler court concluded that the jury, having been

instructed on both felony murder and accountability, had no

choice

but to find defendant guilty of murder, residential burglary and

arson.

     In the instant case, as in Chandler, defense counsel did not

vigorously challenge the prosecution's claim that defendant

participated in the robbery of the victim. Defendant argues that

his counsel's alleged concession of his guilt in the robbery

during

closing argument, i.e., counsel's statement that "if he's

[defendant's] guilty of anything, he's guilty of robbery," should

compel us to conclude that he received ineffective assistance of

counsel.

     However, Chandler does not mandate a finding of ineffective

assistance of counsel in the instant case.

Ineffective-assistance-

of-counsel claims must be determined on a case-by-case basis.

Indeed, the Supreme Court cautioned in Strickland that "a court

deciding an actual ineffectiveness claim must judge the

reasonableness of counsel's challenged conduct on the facts of

the

particular case, viewed as of the time of counsel's conduct."

Strickland, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at

2066. We reiterate here that ineffective-assistance-of-counsel

claims must be viewed under the totality of the circumstances of

each individual case.

     We also note that defendant has mischaracterized this

court's

holding in Chandler. The court's finding of ineffective

assistance

did not rest exclusively on Chandler's counsel's alleged failure

to

develop a theory of innocence. Rather, the Chandler court further

observed that the defense counsel's performance was deficient

because he failed to cross-examine several key prosecution

witnesses; cross-examined others in an extremely conclusory

manner;

and called no witnesses to testify, including defendant, even

though counsel had asserted that defendant would do so during

opening argument.

     In contrast, defense counsel in the instant case

aggressively

cross-examined virtually every witness for the prosecution and

called several witnesses on defendant's behalf in an effort to

undermine the credibility of the State's witnesses and to bolster

that of the defendant. Ultimately, it was the defendant's own

statements, both to the FBI and on the witness stand, and not the

actions or strategy of his counsel, which undermined any claim of

innocence that defendant may have had. If a defendant enters a

not-

guilty plea in the face of overwhelming evidence of his guilt, we

are unwilling to find that his counsel was ineffective simply

because he failed to contrive a leak-proof theory of innocence on

defendant's behalf. To do so would effectively require defense

attorneys to engage in fabrication or subterfuge.

     Here, defense counsel sought to minimize his client's

admitted

involvement in the robbery scheme and to shift the blame for the

robbery and murder onto Jean Rogoz, who had voluntarily

accompanied

defendant to the crime scene. Defense counsel aggressively

attacked

the credibility of Jean Rogoz and portrayed her as a calculating

cocaine addict who seduced defendant into assisting her in a

robbery during which she killed the victim. It is apparent that

defense counsel sought to convince the jury that defendant's

minimal involvement in the scheme warranted either a finding of

innocence or a conviction for robbery only. While this strategy

was

risky, it was strategy nonetheless, and perhaps the only strategy

which could have been seriously pursued given defendant's

admissible incriminating statements and the overwhelming evidence

of his guilt. Defendant now contends that his trial counsel

should

have presented a reasonable doubt theory, i.e., defendant played

no

role whatsoever in the crime which Jean Rogoz perpetrated.

However,

it is arguable that that strategy would have been even less

credible and less likely to succeed than the one his attorney

actually pursued. Under the circumstances of this case, defense

counsel's performance was not deficient with respect to his

proffered defense theory.

     Defendant further contends that his counsel was ineffective

for failing to challenge defendant's eligibility for the death

penalty during the eligibility phase of the sentencing hearing.

     During this phase, the State argued that defendant was

eligible for the death penalty based on the aggravating factor

listed in section 9--1(b)(6) of the Criminal Code of 1961, i.e.,

killing another individual during the course of a felony. In

order

to prove defendant eligible under this section, the State had to

prove beyond a reasonable doubt that (1) defendant had attained

the

age of 18 or more at the time of the offense and (2) the victim

was

killed during the course of another felony and defendant acted

with

the intent to kill the victim or with the knowledge that his acts

created a strong probability of death or great bodily harm to the

victim. 720 ILCS 5/9--1(b)(6) (West 1994). Toward this end, the

State introduced defendant's birth certificate and the jury

verdicts finding defendant guilty of murder and guilty of armed

robbery.

     Defense counsel declined to make an opening statement in the

eligibility phase, presented no evidence, and made no argument

against a finding of eligibility for the death penalty. After

taking judicial notice that he was present when the jury verdicts

were returned and that judgment was entered on those verdicts,

the

sentencing judge found that defendant was eligible for the death

penalty.

     Defendant claims on appeal that his counsel's inaction,

especially his failure to contend that defendant was ineligible

for

the death penalty because he did not have a culpable mental state

at the time of murder, constitutes ineffective assistance of

counsel. The State responds that his counsel's actions were not

ineffective, given that any argument in opposition to eligibility

was doomed to fail and that defendant cannot possibly show that

he

suffered prejudice under the second prong of Strickland.

     We agree with the State. Defendant cannot show, under the

second prong of Strickland, that there is a reasonable likelihood

that, but for counsel's inaction, the result of the eligibility

proceeding would have been different. In People v. Johnson, 149

Ill. 2d 118 (1992), the jury was charged with instructions which

included intentional murder, knowing murder and felony murder,

whereupon it returned a general verdict. The sentencing judge

took

judicial notice of the jury's verdict and found defendant

eligible

for the death penalty. Defendant argued that the trial court

failed

to make any finding that defendant acted with the intent

necessary

to find him eligible under the statutory aggravating factors for

felony murder. This court rejected defendant's argument:

               " ` "[W]here an indictment contains several counts

          arising out of a single transaction, and a general

          verdict is returned the effect is that the defendant is

          guilty as charged in each count, and if the punishment

          imposed is one which is authorized to be inflicted for

          the offense charged in any one or more of the counts,

the

          verdict must be sustained." ' " Johnson, 149 Ill. 2d at

          157, quoting People v. Thomkins, 121 Ill. 2d 401,

455-56

          (1988).

The Johnson court thus concluded that the general verdict raised

the presumption that the jury found the defendant guilty of

felony

murder.

     Johnson undermines defendant's claim that, had his attorney

challenged his eligibility, the sentencing judge would have found

that he lacked the requisite intent under the aggravating felony

murder factor and was not eligible for the death penalty. After

taking judicial notice that he was present when the jury verdicts

were returned and that judgment was entered on those verdicts,

the

sentencing judge below ruled that defendant was eligible for the

death penalty. Since the jury verdicts encompassed the necessary

finding of intent, and since the trial judge took judicial notice

of these verdicts, his conclusion that defendant acted with the

requisite intent to be eligible for the death penalty cannot be

assailed. See Johnson, 149 Ill. 2d at 157.

     Moreover, we note that the sentencing judge heard the

overwhelming evidence against defendant at trial. In finding the

defendant guilty of first degree murder, the jury rejected the

notion that defendant was not the primary actor in the victim's

death. There can be little doubt that the trial judge did as

well.

Indeed, prior to handing down defendant's sentence, the trial

judge

stated:

               "I have listened to the evidence along with the

          jury. *** [T]he initial mover, the sole mover and

almost

          the total mover in all of the acts that culminated in

the

          death of Danny Schneider were perpetrated by the

          defendant Mr. Shatner. *** So let me set the facts

          straight as I view the facts. I believe that you did it

          from the get go. You planned it. *** You chocked [sic]

          him. You have beat him. And the worse [sic] part about

          the whole thing, is then you set him on fire. That, Mr.

          Shatner, is outrageous."

     From these comments, it is apparent that defendant's

contention that his eligibility hearing might have been different

had his counsel contested eligibility is speculative at best.

Defendant thus cannot satisfy the prejudice prong of the

Strickland

test, and his claim of ineffective assistance of counsel at the

eligibility phase must be rejected.

II. Denial of Defendant's Right to Cross-Examine a Witness for

                             the Prosecution

     Defendant next argues that the trial court denied him his

sixth amendment right to confront and cross-examine witnesses

against him where the court limited his cross-examination of Jean

Rogoz. During cross-examination of Rogoz, defense counsel asked

her

whether the victim had stayed at Joaquin's house the night prior

to

his death. She responded that he had not. The following exchange

then occurred:

               "Q. Do you recall that he was not there that

          evening?

               A. Right.

               Q. So, it is your testimony that he came to pick

you

          up the next morning?

               A. I called him to come get me.

               Q. Do you ever remember telling a police detective

          and that would be McLaughlin that you had stayed

          overnight there with Danny Schneider and had spent the

          evening of August 31st to September 1st using drugs?

               A. The first time I went in, I didn't tell them

the

          whole truth.

               Q. My question is, do you remember telling the

          police officer--

               A. I don't remember telling her.

               Q. Let me show you something that might refresh

your

          recollection.

               MR. GOEBEL. Objection, judge.

               THE COURT: Sustained. You can perfect it with the

          officer.

               MR. CHERONIS: I would think I could test her

          recollection with anything.

               THE COURT: No, not with that. Those are the

          detective's words."

     Defendant contends that, because the trial court sustained

the

objection to the introduction of the police report, defense

counsel

was unable refresh Rogoz's recollection as to her prior

statements

to the detective about what had occurred on the evening on August

31. Since he could not refresh Rogoz's recollection, defendant

continues, the trial court frustrated his attempt to compel Rogoz

to admit that she had made a prior inconsistent statement, i.e.,

that the victim stayed at Joaquin's residence the evening before

his death. Defendant maintains that the trial court thus violated

his right to confront a key prosecution witness, entitling him to

a new trial.

     The record, however, belies defendant's contention that he

was

merely attempting to refresh Rogoz's recollection with the

introduction of the detective's report. Instead, it reveals that

defendant sought to impeach her with the report. As the trial

court

properly recognized, once Rogoz testified that she did not

remember

giving the particular statement to the detective, defendant could

only impeach her through the testimony of the detective to whom

she

allegedly made the statement. Defense counsel could not attempt

to

impeach Rogoz with the detective's written statement. See People

v.

Lucas, 132 Ill. 2d 399, 430 (1989).

     Even assuming, arguendo, that defendant merely sought to

refresh Rogoz's recollection with the detective's statement, he

failed to lay a proper foundation in attempting to do so. It is

true, as defendant contends, that a police report may be used to

refresh recollection. Rigor v. Howard Liquors, Inc., 10 Ill. App.

3d 1004, 1010 (1973). However, it is fundamental that a witness'

memory can be refreshed only after it has been established that

the

witness has no memory concerning the facts in question. People v.

Kraus, 377 Ill. 539, 545 (1941). If a witness has testified that

his memory is exhausted, a written memorandum may be used to

refresh and assist his memory, but the manner and mode of

refreshing a witness' memory rests within the discretion of the

trial court. People v. Van Dyk, 40 Ill. App. 3d 275, 279 (1976).

     In the instant case, defendant's cross-examination of Rogoz

did not establish that her memory was exhausted or that she

needed

the detective's report to refresh her recollection as to the

events

which took place the evening of August 31. Rather, Rogoz

testified

that she did not recall making one particular statement to a

police

detective. That, in and of itself, was not sufficient to fulfill

the foundational requirement that the witness' memory had been

exhausted. Thus, the trial court did not abuse its discretion by

refusing to allow defense counsel to refresh Rogoz's recollection

with the detective report.

       III. Validity of Defendant's Waiver of a Jury for

Sentencing

     Next, defendant claims that his waiver of his right to be

sentenced by a jury was not knowing and intelligent because the

trial court failed to admonish him that one juror could prevent

the

imposition of the death penalty. We disagree.

     This court has repeatedly held that a defendant need not be

expressly advised of the nonunanimity rule, i.e., that the vote

of

a single juror will preclude the imposition of the death penalty.

People v. Ramey, 152 Ill. 2d 41, 59 (1992); People v. Erickson,

117

Ill. 2d 271, 295-96 (1987). Moreover, we have further declined to

impose a requirement that the trial court advise the defendant

that

the jury's decision to impose the death penalty must be

unanimous.

Ramey, 152 Ill. 2d at 59; People v. Evans, 125 Ill. 2d 50, 89-90

(1988).

     Defendant raises no arguments which persuade us to

reconsider

these decisions. Our review of the record reveals that a valid

jury

waiver occurred insofar as the trial court explained to defendant

that he was waiving the right to have the jury consider the

capital

sentencing issues and that the sentencing decision would,

therefore, be made by the court alone. See Ramey, 152 Ill. 2d at

59. Accordingly, we reject the defendant's jury waiver argument.

               IV. Introduction of Gang Affiliation Evidence

     Defendant next claims that he was denied his due process

right

to a fair sentencing hearing and his first amendment right of

freedom of association where the State introduced evidence of his

gang affiliation. Relying on Dawson v. Delaware, 503 U.S. 159,

117

L. Ed. 2d 309, 112 S. Ct. 1093 (1992), defendant alleges that his

death sentence should be vacated since this evidence was not

relevant to any issue at sentencing.

     Initially, the State counters that defendant has waived this

argument on appeal by failing to properly object to its

introduction at trial. During the State's examination of Benjamin

Lieu, who shared a cell with defendant while they were

incarcerated

in the Cook County jail, the following colloquy occurred:

               "Q. Mr. Lieu, could you please tell the court

          whether or not you ever talked about any gang

affiliation

          with defendant?

               A. Like can you be more specific, like talk about

a

          gang activity in the cell or--

               MR. CHERONIS: OBJECTION TO THAT.

               A. O [sic] over over.

               THE COURT: Overruled.

               MR. GOEBEL: Q. Did you know whether or not he

          belonged to a gang?

               A. Yes, he does.

               Q. How do you know that?

               A. Because he has a tattoo on his back.

               Q. What kind of tattoo?

               A. A crown.

               Q. Do you know what that symbolizes?

               A. Yes.

               Q. What [is] that?

               A. A particular gang.

               Q. What gang?

               A. Gaylord.

               Q. Did he claim he had any rank in the Gaylord

Gang?

               A. Yes." (Emphasis added.)

The State maintains that defense counsel only objected to the

introduction of gang ACTIVITY evidence and not to the

introduction

of gang AFFILIATION evidence.

     Although defense counsel's objection lacked specificity, we

will assume, arguendo, that defense counsel's objection went to

the

State's introduction of gang affiliation testimony in general,

not

merely the introduction of gang activity testimony, and that

defendant properly preserved his objection.

     In Dawson, the Supreme Court held that a defendant's first

amendment right to freely associate is violated when the State

introduces evidence during a death penalty hearing regarding a

defendant's gang affiliation, when it is irrelevant to proving

any

aggravating circumstances. The Dawson court further held,

however,

that the erroneous introduction of such gang affiliation evidence

is subject to a harmless error analysis. Dawson, 503 U.S. at 168-

69, 117 L. Ed. 2d at 319, 112 S. Ct. at 1099.

     We conclude that, if error occurred, the State's

introduction

of the gang affiliation evidence was harmless beyond a reasonable

doubt. See People v. Ward, 154 Ill. 2d 272 (1992). The sentencing

judge considered numerous aggravating factors in the instant

case,

including the defendant's principal role in the acts which

culminated in the victim's death; the premeditated nature of the

murder; the fact that the defendant set the victim on fire; the

defendant's criminal history; and the defendant's lack of remorse

after the crime. The contrary mitigating evidence was minimal,

consisting of testimony that defendant felt unloved as a child,

began experimenting with drugs at an early age, and that, prior

to

his arrest, was gainfully employed and had treated his current

girlfriend well. Moreover, the testimony concerning defendant's

gang affiliation was brief and isolated, and the sentencing judge

did not even mention it during his sentencing summation.

Therefore,

we conclude that the introduction of defendant's gang affiliation

evidence was harmless beyond a reasonable doubt.

              V. Introduction of Religious Practices Evidence

     Defendant next contends that he was denied his first

amendment

right to the free exercise of his religion where his religious

activities were introduced in aggravation during his sentencing

hearing. Specifically, defendant complains of his cellmate's,

Benjamin Lieu's, testimony concerning the religious rituals

defendant practiced and the religious materials defendant read

while in their cell.

     The State argues that defendant failed to object to the

introduction of this testimony and, as a result, he has waived

the

issue for purposes of appeal. See People v. Enoch, 122 Ill. 2d

176,

186 (1988) (holding that to properly preserve an issue for

review,

both a trial objection and a written post-trial motion are

required). Our review of the record reveals that defendant failed

to make a contemporaneous objection to the introduction of his

religious activities at trial. We therefore find any error

waived.

     Defendant contends, however, that this court should review

his

free exercise claim under the plain error doctrine. Even where a

defendant fails to properly preserve an issue for review, plain

errors affecting substantial rights may be considered if (1) the

evidence is closely balanced or (2) the error is of such

magnitude

that it deprives the defendant of a fair sentencing hearing.

People

v. Fields, 135 Ill. 2d 18, 60 (1990). Since we conclude that the

trial court did not err in admitting the religious activities

evidence, we shall not review defendant's claim under the plain

error rule.

     In Dawson, the United States Supreme Court emphasized that

there is no per se bar to the admission of evidence concerning

beliefs or activities which are protected under the first

amendment; rather, the evidence is admissible if it bears a

relationship to the charged crime. Dawson, 503 U.S. at 165-66,

117

L. Ed. 2d at 317, 112 S. Ct. at 1098.

     Dawson indicates, then, that evidence of constitutionally

protected religious activities is admissible if used for

something

more than general character evidence. Here, the testimony

concerning the religious rituals defendant practiced and the

religious materials he read was not introduced as mere character

evidence; rather, it was "tied" to the murder of his victim. See

Dawson, 503 U.S. at 166, 117 L. Ed. 2d at 317, 112 S. Ct. at

1098.

At trial, Jean Rogoz testified that when she asked defendant why

he

set the mattress on fire and burned the victim, defendant

replied,

"To free his spirit." Similarly, Lieu testified at trial that

defendant told him that he hit the victim several times because

the

victim's spirit was very strong. At the sentencing hearing, Lieu

testified that defendant chanted and tossed an eagle feather

about

while naked in his cell, claiming that these actions would cause

"the spirits to come." Not only did Lieu's testimony at the

sentencing hearing corroborate Rogoz's testimony at trial, it

also

shed light on defendant's peculiar statements following the

crime.

The evidence suggests that defendant's religious beliefs informed

his actions during the murder of the victim. As such, we find

unpersuasive defendant's assertion that the religious activities

evidence introduced at the sentencing hearing constituted nothing

more than irrelevant character evidence held impermissible under

Dawson. The trial court thus did not err in admitting this

evidence

in aggravation at the sentencing hearing.

                VI. Defense Counsel's Failure to Object to

                           Aggravation Evidence

     Defendant next argues, in anticipation of this court's

conclusion that his counsel failed to properly object to the

introduction of the gang affiliation or religious activities

evidence, that his counsel was ineffective for his failure to do

so. Since we have previously concluded that defense counsel's

objection to the gang affiliation evidence was sufficient to

preserve the issue for review, we need only address whether

defendant's counsel was ineffective for his failure to object to

the introduction of the religious activities evidence.

     As previously noted, claims of ineffective assistance of

counsel are examined under the two-prong test established in

Strickland. Under Strickland, a defendant must show both that his

counsel's performance fell below the objective standard of

reasonableness and that there is a reasonable probability that,

but

for counsel's errors, the result of the proceeding would have

been

different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104

S.

Ct. at 2068.

      Since we have determined that evidence concerning

defendant's

religious activities was admissible at the sentencing hearing,

defendant cannot argue that it was unreasonable for his attorney

to

fail to object to its admission. See People v. McCarthy, 213 Ill.

App. 3d 873, 887 (1991) (noting that whether to object is a trial

strategy, and to object when it would be overruled would be

futile). In that defendant cannot meet his burden under the first

prong of the Strickland test, his ineffective-assistance claim

must

be rejected.

        VII. Defendant's History of Drug Abuse Used as

Aggravation

     Defendant further claims that he was denied a fair

sentencing

hearing where the sentencing judge failed to consider defendant's

drug abuse history as a mitigating factor and instead deemed it

to

be aggravating.

     This court has never held, and defendant directs us to no

cases in which an Illinois court has held, that a sentencing

judge

must consider defendant's drug use as a mitigating factor in

sentencing decisions, and we decline to so hold here. Simply

because the defendant views his drug abuse history as mitigating

does not require the sentencer to do so. In People v. Ward, 154

Ill. 2d 272 (1992), we considered an argument analogous to the

one

defendant now advances. The Ward defendant claimed that the

evidence of his troubled childhood was necessarily mitigating in

nature. In rejecting that argument, this court stated:

          " `Defendant endeavors to persuade us that, because the

          [Eddings] Court has said a sentencer cannot refuse to

          consider relevant mitigating evidence presented by a

          defendant, it has held that a sentencer must give it

some

          mitigating weight. We disagree with the conclusion. The

          Court has held only that when the sentencer is a judge,

          the sentencer cannot refuse to hear evidence introduced

          as mitigating, and cannot refuse to consider whether

that

          evidence is in fact mitigating on the basis that the

          sentencing judge believes the evidence is barred by law

          from being considered as mitigating.' " Ward, 154 Ill.

2d

          at 337, quoting People v. Henderson, 142 Ill. 2d 258,

338

          (1990).

     These observations are equally incisive here. Defendant does

not claim that the sentencing judge refused to hear or believed

he

was somehow precluded from viewing the drug abuse history

evidence

as mitigating. Rather, defendant essentially asserts that the

sentencer should have found that defendant's drug abuse history

in

part explained his criminal behavior. Underlying this premise is

that since drugs are partly to blame for his actions, the

defendant

is somehow less culpable and should not suffer the ultimate

penalty

for his criminal behavior. Simply stated, the sentencing judge

was

under no legal obligation to subscribe to this suggestion. To the

contrary, the sentencing judge was free to conclude, under the

circumstances, that defendant's drug history simply had no

mitigating value but was, in fact, aggravating. See Ward, 154

Ill.

2d at 337. Accordingly, we reject defendant's claim of error.

                 VIII. Excessiveness of the Death Penalty

     Defendant next asserts that his death sentence is excessive

and inappropriate given the evidence of his rehabilitative

potential and other mitigating evidence presented at the

sentencing

hearing. We disagree.

     Analysis of the propriety of the death sentence requires an

individualized consideration of the circumstances of the offense

and of the character and background of the offender. Eddings v.

Oklahoma, 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct.

869, 874-75 (1982); People v. Strickland, 154 Ill. 2d 489, 534

(1992). In deciding whether imposition of the death sentence in a

particular case is excessive, this court examines whether the

circumstances of the crime and the character of the defendant are

such that the deterrent and retributive functions of the ultimate

sanction will be served by imposing the death penalty. People v.

Tye, 141 Ill. 2d 1, 29 (1990).

     The evidence presented at trial established that defendant

committed a cold-blooded, unprovoked murder: he strangled and

beat

the victim and then set him on fire in a scheme to steal his VCR

so

that he could purchase cocaine. Additionally, the State presented

significant evidence in aggravation. Defendant's criminal history

included theft, criminal damage to property, battery and

resisting

arrest. He showed little, if any, remorse for his actions and,

since being incarcerated, he has been involved in physical

altercations and a shank was found in his cell.   

     In contrast, the evidence defendant presented in mitigation

was minimal, consisting of testimony that defendant felt unloved

as

a child, that he began sniffing glue at the age of 13, and that,

during the four years he had fled the jurisdiction, defendant

procured gainful employment and a steady girlfriend. Under the

circumstances, the trial court's determination that the

aggravation

evidence outweighed the mitigation evidence is supported by the

record.

      Defendant nevertheless urges this court to find that the

circumstances of the instant case are similar to those in a

limited

number of cases in which this court has found a death sentence

excessive where the offenses were triggered by or resulted from

substantial extenuating circumstances. See People v. Walcher, 42

Ill. 2d 159 (1969); People v. Crews, 42 Ill. 2d 60 (1969); People

v. Johnson, 128 Ill. 2d 253 (1989). We decline to do so. The

record

provides no support for defendant's assertion that he could not

control his actions at the time of the murder because of the

excessive quantity of cocaine he had ingested. To the contrary,

the

calculated manner in which the murder was perpetrated reveals

that

defendant was in control of his faculties at the time of the

offense. We therefore conclude that the trial court did not err

in

imposing the death penalty under these circumstances.

                IX. Constitutionality of the Death Penalty

     Lastly, defendant contends that the Illinois death penalty

statute is unconstitutional because (1) it allows the sentencer

to

weigh a vague aggravating factor, namely, "[a]ny other reason"

(Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed.

1992)) a defendant should be sentenced to death; (2) it places

the

burden of proof on the defendant and precludes meaningful

consideration of mitigation; and (3) it does not sufficiently

minimize the risk of arbitrarily or capriciously imposed death

sentences. This court has considered and rejected these claims

repeatedly in other contexts. See, e.g., People v. Taylor, 166

Ill.

2d 414, 439 (1995) (rejecting the argument that a sentencer's

consideration of nonstatutory aggravating factors during the

second

stage of a capital sentencing hearing results in the arbitrary

imposition of the death sentence); People v. Page, 155 Ill. 2d

232,

283 (1993) (holding that the death penalty statute does not

preclude a sentencer from giving meaningful consideration to

mitigation evidence); People v. Kubat, 94 Ill. 2d 437 (1983)

(concluding that the death penalty statute ensures adequate

safeguards to prevent the arbitrary or capricious imposition of

the

penalty). Defendant raises no new arguments to persuade us to

reconsider these holdings.

                                CONCLUSION

     For the reasons stated, the judgment of the circuit court of

Cook County is affirmed. The clerk of this court is directed to

enter an order setting Tuesday, January 14, 1997, as the date on

which the sentence of death entered in the circuit court of Cook

County is to be carried out. The defendant shall be executed in

the

manner provided by law. 725 ILCS 5/119--5 (West 1994). The clerk

of

this court shall send a certified copy of the mandate in this

case

to the Director of Corrections, to the warden of the Stateville

Correctional Center, and to the warden of the institution where

defendant is confined.

Affirmed.